UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JOHN A. BOATFIELD, )
 )
    Plaintiff, )
 )
v. ) No. 1:19-CV-027-RLJ-CHS
 )
TONY PARKER, *et al.*, )
 )
    Defendants. )

## **MEMORANDUM AND ORDER**

Acting pro se, John A. Boatfield ("Plaintiff"), a state prisoner confined in the Bledsoe County Correctional Complex ("BCCX") in Pikeville, Tennessee, has filed this civil complaint for injunctive and monetary relief, alleging claims under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") [Doc. 2].[1] Plaintiff also has submitted a motion for leave to proceed *in forma pauperis* [Doc. 1]. Plaintiff's motion reflects that he lacks the financial resources to pay the filing fee all at once and, therefore, his *in forma pauperis* motion [*Id.*] is **GRANTED**. Plaintiff will be permitted to pay the filing fee on an installment basis, in accordance with the statutory provisions governing such payments. *See* 28 U.S.C. § 1915(b).

---

[1] Plaintiff asserts that he wishes to preserve a state tort action for malpractice "for a later time" [Doc. 3 at 4]. Plaintiff also alleges, broadly interpreting his contentions, a violation of the Tennessee Constitution [Doc. 2 at 8, 20]. A claim based on the Tennessee Constitution is not an actionable § 1983 claim because "Tennessee does not recognize a private cause of action for violations of the Tennessee Constitution." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) (citing *Lee v. Ladd*, 834 S.W.2d 323 (Tenn. Ct. App. 1992)). No further discussion of this claim is necessary.

For the reasons set forth below, the Court will dismiss Plaintiff's case as untimely and for failure to state a claim entitling him to relief under § 1983 and the other federal statutes sued upon. The Court will also deny Plaintiff's other pending motions as moot.

## I. SCREENING STANDARDS

District courts must screen complaints filed *in forma pauperis* and dismiss *sua sponte* a complaint that is frivolous or malicious, that fails to state a claim for relief, or that seeks monetary relief from a defendant who enjoys immunity from such relief. *See, e.g.,* 28 U.S.C. § 1915(e)(2)(B); *Begola v. Brown*, No. 97-2194, 1998 WL 894722, at *1 (6th Cir. Dec. 14, 1998) (citing *McGore v. Wrigglesworth*, 114 F.3d 601, 604 (6th Cir. 1997), *overruled on other grounds by Jones v. Bock*, 549 U.S. 199 (2007), and *LaFountain v. Harry*, 716 F.3d 944, 951 (6th Cir. 2013)). The dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and in *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007) "governs dismissals for failure state a claim under [28 U.S.C. § 1915(e)(2)(B)] because the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). Thus, to survive an initial screening, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Courts liberally construe pro se pleadings filed in civil rights cases and hold them to a less stringent standard than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Allegations that give rise to a mere possibility that a plaintiff might later establish undisclosed facts supporting recovery, however, are not well-pled and do not state a plausible claim. *Twombly*, 550 U.S. at 555, 570. Further, formulaic and conclusory recitations of the elements of a claim unsupported by facts are insufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 681.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must establish that he was deprived of a federal right by a person acting under color of state law. *Black v. Barberton Citizens Hosp.*, 134 F.3d 1265, 1267 (6th Cir. 1998); *see also Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990) (stating that "Section 1983 does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere"). In other words, a plaintiff must plead facts sufficient to show: (1) the deprivation of a right, privilege, or immunity secured to him by the United States Constitution or other federal law; and (2) that the individual responsible for such deprivation was acting under color of state law. *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000).

## II.  PLAINTIFF'S ALLEGATIONS

In his 83-count complaint [Doc. 2], Plaintiff sues twelve Defendants: (1) Tony Parker, Commissioner of the Tennessee Department of Correction ("TDOC"); (2) Keven Hampton, BCCX Warden; (3) Brett Cobble, BCCX Assistant Warden of Treatment; (4) Lee Dobson, TDOC Acting Assistant Commissioner of Prison Operations; (5) the State of Tennessee; (6) TDOC; (7) Jefferey Belknap, M.D.;[2] (8) Centurion Health Services, a health services corporation under contract with TDOC to provide medical care to BCCX inmates; (9) Teresa Guetner, M.D. and Chief Physician at BCCX; (10) Kathryn Campbell, Centurion Health Services Administrator at BCCX; (11) Tammy Farmer, R.N.; and (12) TDOC Medical Review Board. Plaintiff has named Defendants in their official capacities or in their individual and official capacities [*Id.* at 26].

---

[2] Plaintiff spells this Defendant's last name as both "Belknap" and "Belknapp" in the text of his complaint and accompanying memorandum brief [Docs. 2-3]. For the sake of consistency, the Court spells this Defendant's last name as Plaintiff spelled it in the caption of his pleading, i.e., "Belknap" [Doc. 2 at 1].

The events out of which this lawsuit arose began in October of 2017. During that month, Defendant Dr. Belknap diagnosed Plaintiff as having temporal arteritis and placed him on a daily dose of steroid medication (60 mg of Prednisone[3]) to alleviate his pain [Doc. 2 at, Doc. 3 at 4]. Defendant Belknap forewarned Plaintiff that the medication would interfere with Plaintiff's sugar levels but that he (Dr. Belknap) would double Plaintiff's dose of Metformin to take care of that side effect. Defendant Belknap told Plaintiff that he would need to have a biopsy within the first week to determine the severity of the disease. Dr. Belknap further told Plaintiff that he need not have his blood sugar level tested because the medication would "keep it under check" [Doc. 2 at 6].

During the following few weeks, Plaintiff began feeling sick and irritable. This prompted him to file two different institutional forms requesting medical care. Nurses unsuccessfully tried to intervene on Plaintiff's behalf, but his condition worsened. Around 6:30 A.M. on December 20, 2017, Plaintiff went to the BCCX medical clinic, where he collapsed into the arms of a correctional officer. Plaintiff's blood sugar level was measured and was so elevated at 315, that he was seen by a Dr. Sevendsen, who ordered a blood test to be performed "stat" on Plaintiff.

Plaintiff was given an IV and, based on the results of the blood test, 3 vials of Albuterol through a breathing apparatus "to push the potassium out into the cells and allow it to be broken down by the body." Dr. Sevendsen told Plaintiff, "High potassium will kill you and yours was high" [Doc. 2 at 7]. Plaintiff received IV fluids in the clinic until about 3:00 P.M., then was transferred to the BCCX Site-1 Infirmary, where he remained until December 27, 2017.

---

[3] Prednisone has been described as a "synthetic glucocorticoid derived from cortisol, administered orally as an antiinflammatory and immunosuppressant in a wide variety of disorders." *Bowman v. Astrue,* No. CIV.07-4940, 2009 WL 749796, at *2 n.5 (D. Minn. Mar. 18, 2009) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1531 (31st Ed. 2007)).

While Plaintiff was a patient in the infirmary, a Dr. Terpstra told him: "What they have done to you is just unbelievable. Your Adrenal Gland was shutting done (sic) due to the steroid and this is affecting the other organs because the gland regulates blood flow" [*Id.*]. Dr. Terpstra further advised Plaintiff that, as he was weaned off the steroid, his adrenal gland would respond slowly but that, over time, it would recover. Plaintiff returned to the BCCX compound on December 27, 2017. A few days later, his blood sugar level increased to 600, and he was treated with insulin and IV fluids to help decrease his blood sugar level. This sequence of events became a pattern—when Plaintiff's blood sugar level increased to 600+, he would be given 15 units of regular insulin and, when it measured 300+, he would receive 10 units. Sometimes, Plaintiff would be treated with IV fluids as well.

On January 2, 2018, Plaintiff was sent to the Lois M. Deberry Special Needs Facility ("SNF") to see a rheumatologist and another physician. Both physicians explained to Plaintiff that he did not have temporal arteritis and that his blood markers did not reflect that he had the disease. According to Plaintiff, the physicians he saw at SNF told him that, even if he had had temporal arteritis, they would not have given him such a high dose of steroids and most certainly would not have given the steroids to him for the length of time he had been taking them.

On January 9, 2018, a nurse practitioner told Plaintiff that he "did not have temporal arteritis as was diagnosed by Dr. Belknap and they were following the schedule to bring him off of the steroid" [Doc. 2 at 11]. This medical professional also advised Plaintiff that he was "now a full blown diabetic" and that that she could not say whether he could ever stop taking insulin or how much damage had been done to his pancreas. [*Id.*].

5

On January 31, 2018, Plaintiff declined to go to SNF for the biopsy recommended by Dr. Belknap because several physicians and a nurse practitioner had informed Plaintiff that laboratory results performed on him some three weeks after he had started the steroids had shown that he did not have temporal arteritis. Plaintiff has continued to experience an unstable blood sugar level and to undergo commensurate treatment.

In February of 2018, Defendant Dr. Guetner, BCX Chief Physician, discussed with Plaintiff the treatment rendered to him by Dr. Belknap (who was no longer employed by Centurion); told Plaintiff that his condition had become grave and serious; and advised Plaintiff that it was good that he had come to the clinic when he did so that his impending health crisis could be arrested [*Id.* at 16]. Defendant Guetner apologized to Plaintiff for Dr. Belknap's actions, told him that they would do everything in their power to rectify the wrong done to Plaintiff, and that they would continue closely to monitor his treatment [*Id.*]. Dr. Guetner then examined Plaintiff and told him that he was improving and progressing. Since that time, Plaintiff has heard nothing from Dr. Guetner.

As a result of the misdiagnosis, steroid treatment, and resulting ill effects from the steroids, Plaintiff was referred for mental health treatment [*Id.* at 11]. Plaintiff has been treated by a mental health provider since the Fall of 2018 and, as a result of sleep disruption, has been receiving a sleep medication (Vistaril), though he is reluctant to take medication due to the ordeal he endured from taking steroids [*Id.* at 15]. Plaintiff has been having headaches, for which he has received treatment, and he is sleeping better and is less irritable [*Id.* at 14, 16].

Plaintiff maintains that he has lost normal daily function and that the pain and suffering he sustained as a result of Dr. Belknap's actions and the actions or inactions of other Defendants has left him irritable, angry and mistrustful [Doc. 3 at 6]. Plaintiff requests injunctive and monetary relief for the alleged violations of his rights [Doc. 2 at 24-25].

## III. DISCUSSION

### A. Statute of Limitation

For the purposes of 42 U.S.C. § 1983, state statutes of limitations apply to determine the timeliness of claims. *Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985), *superseded by statute on other grounds as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377-80 (2004). The one-year statute of limitations period contained in Tennessee Code Annotated § 28-3-104(a) applies to civil rights claims arising in Tennessee. *See Berndt v. Tennessee*, 796 F.2d 879, 883 (6th Cir. 1986); *see also Porter v. Brown*, 289 F. App'x. 114, 116 (6th Cir. 2008) ("[O]ur precedent has long made clear that the limitations period for § 1983 actions arising in Tennessee is the one-year limitations provision found in Tenn. Code Ann. § 28-3-104(a)."). Ordinarily, the statute begins to run when a plaintiff knows or has reason to know of the injury upon which his action is based. *See Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 636 (6th Cir. 2007); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984).

The central claim in the complaint involves Plaintiff's misdiagnosis of temporal arteritis and the side effects visited on him from the high dose of steroid medication he received to treat a disease from which he later learned he did not suffer. The initial events giving rise to Plaintiff's claims (the misdiagnosis and beginning of steroidal treatment) occurred in October of 2017, and the steroidal treatment continued, at the latest, until January 2, 2018, when he was transported to the SNF and advised by two physicians that he did not have temporal arteritis and that blood tests did not indicate that he had it [Doc. 2 at 9]. These physicians further advised Plaintiff that, had they themselves diagnosed Plaintiff with that disorder, they would not have "placed him on such a high dose of steroid

7

and most certainly not for as long" and that his immune system had been so weakened by the steroid that he "may have contracted Tuberculosis" [*Id.*].[4]

Plaintiff therefore would have known of any injury he incurred from a constitutional violation by January 2, 2018, the date he was informed that he did not have temporal arteritis and that he had sustained severe side effects from taking 60 mg doses of Prednisone. This means that Plaintiff would have had one year from the that date, i.e., January 2, 2019, to file this instant § 1983 action.

Under the prison mailbox rule in *Houston v. Lack*, 478 U.S. 266, 276 (1988) (deeming an inmate's submission to be filed on the date it is properly delivered to prison officials for mailing to the district court), Plaintiff filed this case on January 31, 2019 (when he signed his complaint, *see Towns v. United States*, 190 F.3d 468, 469 (6th Cir. 1999) (deeming that a pleading signed under penalty of perjury one day before the lapse of the relevant limitation statute was delivered to prison officials before the filing deadline)) [Doc. 2 at 27], some twenty-nine days after the statute lapsed.

Therefore, the applicable statute of limitations bars Plaintiff's claims, and they are subject to dismissal for failure to state a claim. *See Jones v. Bock*, 549 U.S. 199, 215 (2007) (noting that "[i]f the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim"). Furthermore, claims that are time-barred under the relevant statute of limitations are frivolous. *See Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001). Even if the claims are not time-barred, they have no merit.

---

[4] Plaintiff possibly was advised similarly about the side effects he sustained from taking the high dose of Prednisone when he was treated at the BCCX infirmary on December 20, 2017. However, Plaintiff's contentions relevant to this point are opaque and, hence, the Court cannot infer that such advice was given.

**B.     Medical Claims**

    **1.     Governing Law**

The "Cruel and Unusual Punishments" provision in the Eighth Amendment prohibits conditions and treatment that involve the wanton and unnecessary infliction of pain on a prisoner. *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981). An Eighth Amendment claim is comprised of two elements: an objective element, which means that a plaintiff must allege a sufficiently serious deprivation, and a subjective element, which requires that he demonstrate that a defendant possessed a state of mind of deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference to the serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," which violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

A serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004). To establish deliberate indifference, a plaintiff must allege plausibly that a defendant was aware of facts from which the defendant could infer that the inmate faced a substantial risk of harm and that the defendant actually drew that inference. *Farmer*, 511 U.S. at 837. Deliberate indifference is a stringent standard of fault, in that it involves a state of mind comparable to criminal recklessness, *Id.*, at 839-40, or to a "deliberateness tantamount to intent to punish." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (2005) (quoting *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)). It is not necessary, however, for a plaintiff to demonstrate that the official acted "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Yet, a prisoner whose claims are based on a theory of medical negligence has not stated a claim under § 1983 because medical malpractice is not a constitutional violation. *Estelle*, 429 U.S. at 106. Similarly, no claim is stated where some medical treatment is given and the dispute is over the adequacy of such treatment. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). For instance, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001); *but see Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002) (a plausible deliberate indifference claim may be established by "grossly inadequate medical care" that is "so cursory as to amount to no treatment at all" or "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness").

2. **Analysis**

   a. **Eighth Amendment Violations (Denial of Proper Medical Treatment)**

As can be seen from the previous recital of facts alleged in the complaint, the premise of Plaintiff's Eighth Amendment claims is that Dr. Belknap, by misdiagnosing him and treating him for a non-existent medical condition, exhibited deliberate indifference to his serious medical needs. Plaintiff contends that the steroids he took for a month for temporal arteritis had devasting effects on him, both physically and mentally, and that, but for Dr. Belknap's misdiagnosis, he would not have suffered the harms visited on him by taking the steroidal medication [Doc. 3 at 4 (asserting that "if Dr[.] Belknap had not misdiagnosed his condition to begin with in the month of October 2017, Plaintiff would not have to endure month of 'cruel and unusual pain and suffering'")].

In this case, by Plaintiff's own allegations, he saw multiple medical care providers; was tested and treated with various medications (albeit, for a short period for a non-existent disease); was examined; and was referred to the SNF for assessment/treatment. Defendants did not disregard Plaintiff's need for medical care, but took reasonable steps to diagnose and treat him. At best, Plaintiff's contentions that Dr. Belknap incorrectly diagnosed him as having temporal arteritis and afforded him treatment for that condition that ultimately harmed him would comprise a claim for medical negligence. The Court concludes that the Plaintiff has not shown any evidence of deliberate indifference on the part of Defendant Dr. Belknap. *Farmer*, 511 U.S. at 835 (Deliberate indifference "entails something more than mere negligence.").

Plaintiff's allegations (i.e., that Dr. Belknap did not reach the proper diagnosis and treated him with medication that harmed him) have been examined under the "grossly inadequate care" standard enunciated in *Terrance*, a case to which Plaintiff cited in his complaint [Doc. 2 at 20]. The Sixth Circuit has held that "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Terrance*, 286 F.3d at 843-44. Here, though it was ultimately proven to be the wrong treatment (because the diagnosis was wrong), Plaintiff received a great deal of medical attention and treatment and there are no facts to show that it was cursory.

While Plaintiff claims that an incorrect diagnosis and treatment for the wrong condition constitutes "grossly inadequate medical-care" [Doc. 2 at 20], his claim, at its heart, sounds in state tort law of medical malpractice. *Estelle*, 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). The questioned conduct (medical malpractice) cannot be said to constitute an unnecessary and wanton infliction of pain. *Id.* at 105-06. The Court sees no constitutional violation here because medical negligence in a prison health care setting is not a

constitutional tort to be pursued under § 1983. *Id.* at 106 ("Medical malpractice does not become a constitutional violation simply because the victim is a prisoner").

Because all other claims against the other Defendants are constituent claims that stem from this alleged act of deliberate indifference to Plaintiff's serious medical needs and because Plaintiff's true claim is one for medical negligence, he has failed to state an Eighth Amendment claim against the other eleven Defendants as well.

### b. Other Deficiencies

#### i. Respondeat Superior

There are additional reasons why Plaintiff's claims cannot advance: One such reason is Plaintiff's theory of liability against most Defendants. Plaintiff does not allege that Defendants (other than Dr. Belknap of course) were personally responsible for misdiagnosing him as having temporal arteritis or for giving him medication to treat a malady that he did not have. Instead, Plaintiff's suit against certain Defendants is based on their failure to properly supervise their subordinates.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal,* 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 69(1978); *Everson v. Leis,* 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight,* 532 F.3d 567, 575 (6th Cir.2008); *Greene v. Barber,* 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter,* 532 F.3d at 575; *Greene,* 310 F.3d at 899; *Summers v. Leis,* 368 F.3d 881, 888 (6th Cir.2004).

This is true even when a defendant fails to act on a grievance involving an inmate's complaints of mistreatment. *See Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006) ("Skinner's complaint regarding Wolfenbarger's denial of Skinner's grievance appeal, it is clear, fails to state a claim."); *Lee v. Mich. Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004) ("Section 1983 liability may not be imposed simply because a defendant denied an administrative grievance or failed to act based upon information contained in a grievance.") (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

This much is clear: Plaintiff seeks to hold many Defendants liable to him for conduct on the part of Dr. Belknap and for Plaintiff's "health crisis" that resulted from that conduct. For example, Plaintiff characterizes Defendant Guetner as the gatekeeper of Plaintiff's well-being, and he faults her for "deliberately neglecting" his medical concerns that arose from the incorrect medical diagnosis and improper treatment rendered by her subordinate, Dr. Belknap, and from her own non-actions as well [Doc. 2 at 16-17]. Plaintiff identifies Defendant Guetner's non-actions as an abandonment of duty or her "place to become and remain involved in plaintiff's serious medical needs, and to know that the terrible condition which plaintiff had come to due to the 'deliberate indifference' of her staff" [*Id.* at 17].

Plaintiff sues Defendant Kathryn Campbell, BCCX's Health Services Administrator, based on her role as the ultimate supervisor of Dr. Guetner, Dr. Belknap, and others who failed to act or respond fully to his numerous requests for medical care and his healthcare concerns [*Id.* at 17-18]. Plaintiff asserts that, by not becoming involved in his medical care, Defendant Campbell maliciously and grossly neglected his condition as it worsened [*Id.*].

Similarly, Plaintiff has named as Defendants Kevin Hampton, BCCX Warden, and Lee Dotson, a TDOC prison official, both of whom likewise were "gatekeepers" of Plaintiff's well-being [*Id.* at 18]. These two Defendants, so alleges Plaintiff, were in the chain of command reviewing

Plaintiff's appeal of a grievance he filed in which he complained about his medical care, but they did not act favorably on the grievance [*Id.*]. This failure to act left Plaintiff with no alternative vehicle that would allow him promptly to obtain healthcare information [*Id.*]. (Plaintiff does not explain what healthcare information he sought, though presumably, the information he sought involved his diagnosis and treatment for temporal arteritis.)

Defendant Tammy Farmer, SNF Health Services Administrator, is sued for sending Plaintiff a letter containing false and misleading information concerning the results of an investigation into his medical treatment and the findings that stemmed from the investigation, and perhaps for misrepresenting Plaintiff's true condition during a conversation she had with Plaintiff's daughter [*Id.* at 20-21]. Additionally, Plaintiff maintains that Defendant Farmer failed, as an administrator, to intercede on Plaintiff's behalf during his health crisis [*Id.* at 21].

Plaintiff has sued Defendants State of Tennessee and TDOC because they are "ultimately responsible for his safe-keeping therefore, acting as plaintiff's primary 'gate-keeper' . . . [ensuring] "appropriate and adequate medical care" [*Id.* at 22]. These governmental entities, Plaintiff maintains, are not insulated from their responsibility by contracting Plaintiff's medical care to a private company, such as Centurion [*Id.*].

The above factual allegations against these Defendants show that Plaintiff is advancing a theory of respondeat superior to justify his claims against them. Because Plaintiff has not pled what these Defendants did, through each Defendant's own individual actions, *see Iqbal*, 556 U.S. at 676, 678; *Robertson v. Lucas*, 753 F.3d 606, 615, (6th Cir. 2014) ("A critical aspect of the § 1983 . . . universe is that to be held liable, a plaintiff must demonstrate '"that each Government-official defendant, through the official's own individual actions, has violated the Constitution."' (quoting

14

*Iqbal*, 556 U.S. at 676)), and because respondeat superior is not a valid theory under § 1983, Plaintiff fails to state a plausible claim against these Defendants based on such a theory.

### ii. "Persons"/Eleventh Amendment Immunity

Plaintiff has named as Defendants the State of Tennessee, TDOC, and the TDOC Medical Review Board. Section § 1983 requires a plaintiff to allege that he was deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States by a person while acting under color of state law. *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978). However, a state and state officials and state agencies sued in their official capacities for monetary damages are not "persons" within the scope of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989).

Also, officials of a state agency, such as TDOC officials and BCCX officers, when sued in their official capacities, are protected by Eleventh Amendment immunity. *Id.* at 71 (reasoning that a suit against a state official in his official capacity is essentially a suit against the state itself, thereby qualifying the official for Eleventh Amendment protection); *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (same); *Johnson v. Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (same). Similarly, a state itself and its agency, when sued as defendants, enjoy immunity under the Eleventh Amendment, unless it consents to suit or Congress abrogates its immunity. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (explaining that "absent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State"); *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 681 (6th Cir. 2018). Neither exception exists here. Thus, Defendants State of Tennessee, TDOC, TDOC Medical Review Board, and BCCX and TDOC employees in their official capacity are shielded from this suit for damages by the Eleventh Amendment.

In addition, the complaint contains absolutely no allegations against Defendant TDOC Medical Review Board. A court need not assume or conjure up claims that a pro se litigant has not

pleaded. *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004). Plaintiff, therefore, has failed to state a plausible claim against Defendant TDOC Medical Review Board on this basis alone.

### iii. Corporate Liability

Defendant Centurion, part of a corporate joint venture with 50 billion dollars of annual revenue that provides medical care for inmates in TDOC's custody [Doc. 2 at 19-20], does not enjoy Eleventh Amendment immunity. To hold Centurion liable, Plaintiff must demonstrate that Centurion's policy, practice, or custom has caused him to sustain a constitutional injury. *See Monell*, 436 U.S. at 688-90 & n.55 (for purposes of a § 1983 action, a "person" includes individuals and "bodies politic and corporate"); *Grayson v. Corr. Corp. of Am.*, No. 1:12-CV-63, 2012 WL 2022440, at *4 (E.D. Tenn. June 5, 2012) (observing that a private entity who contracts to provide medical services to state inmates may be held liable "on the basis of its own policy or custom." (citing *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)); *see also Street v. Corr. Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996) (applying *Monell*'s municipal liability standard to a private corporation that operates prisons).

More specifically, Plaintiff must (1) identify the policy, (2) connect the policy to Centurion itself, and (3) demonstrate that his injury was incurred because of the execution of that policy. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). While an inmate need not plead a theory of municipal liability with particularity, *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993), still he must give fair notice of the claim to a defendant. *Twombly*, 550 U.S. at 555.

Here, to support his *Monell* claim against this corporate defendant, Plaintiff points to Dr. Belknap's comment that Plaintiff needed to start treatment for temporal arteritis with the steroid Prednisone, because that medication was less costly than pain medication and because Centurion was on a cost-cutting mission. Dr. Belknap explained that Plaintiff faced a greater chance of losing his

sight in his left eye if he were not given a steroid. Also, Dr. Belknap told Plaintiff that he could buy Acetaminophen from the commissary.

Even if the Court accepts that Centurion had a policy of cutting the costs of medications it furnished to inmates, Plaintiff cannot show that his injury was incurred because of the execution of the policy. Plaintiff has not demonstrated that he was injured because he took a less expensive medication to treat his diagnosed disease of temporal arteritis. Indeed, by Plaintiff's own accounting, his injury ensued, in the first place, from being misdiagnosed as having temporal arteritis and, in the second place, from taking such a high dose of Prednisone for the length of time he took it [Doc. 2 at 9]. Thus, it was the fact of being treated with a steroid that allegedly harmed Plaintiff. The cost of the medication played no role in that claimed harm. Therefore, Plaintiff has not alleged that the execution of Centurion's supposed cost-cutting policy resulted in an injury.

Similarly, Dr. Belknap's suggestion that Plaintiff buy Acetaminophen from the commissary and his failure to supply Plaintiff with that medication, absent any indication that Plaintiff's indigency prevented him from obtaining pain medication from the commissary, did not result in any injury. This is so because Plaintiff has not claimed that he was financially unable to purchase pain medication and that he suffered pain as a result of being unable to obtain the medication from the commissary.

Because the pleading is missing the third element of a viable *Monell* claim against Centurion, Plaintiff fails to state an actionable § 1983 claim against this corporate Defendant.

### iv.     Federal Statutory Claims

In addition to the Civil Rights Act, 42 U.S.C. § 1983, Plaintiff identifies as statutory authority for this lawsuit the Americans with Disability Act ("ADA"),[5] the Rehabilitation Act ("RA"),[6] and the Religious Land Use and Institutionalized Persons Act ("RLUIPA")[7] [Doc. 2 at 1]. Beyond his perfunctory reference to these statutes, Plaintiff offers nothing in his pleading from which the Court could infer a plausible claim under the ADA, the RA, or the RLUIPA. At the screening stage, a complaint is subject to dismissal, absent sufficient well-pleaded factual averments that, taken as true, "plausibly suggest an entitlement to relief." *Iqbal*, 556 U.S. at 679. Here, where the complaint is devoid completely of factual averments of disability discrimination or burdens on his right to free exercise of religion, Plaintiff fails to state a claim that would sustain a remedy under the ADA, the RA, or RLUIPA.

---

[5]  Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity." 42 U.S.C. § 12132. The ADA applies to state prisons. *Penn. Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Mingus v. Butler*, 591 F.3d 474, 482 (6th Cir. 2010) (citing *Yeskey*, 524 U.S. at 209–10).

[6]  To establish a claim under section 504 of the RA, Plaintiff must show that (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity which receives federal funding; and (3) he was discriminated against on the basis of his disability. 42 U.S.C. § 2000d.

[7]  Under RLUIPA, the government may not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005) (quoting Section 3 of RLUIPA, 114 Stat. 804, 42 U. S. C. §2000cc–1(a)(1)–(2)).

## IV. PENDING MOTIONS

Plaintiff has moved for discovery [Doc. 4] and for notification as to the Court's approval of his application to proceed *in forma pauperis* [Doc. 7]. Because the Court has granted Plaintiff's application proceed *in forma pauperis* and because it is dismissing this case, both motions are **DENIED** as moot.

## V. CONCLUSION

The Court has decided that Plaintiff's claims are untimely and that, alternatively, he has failed to state a claim against Defendants. The Court finds that the claims raised in the complaint are not amenable to an amendment, *see LaFountain*, 716 F.3d at 951 (finding that a court may allow amendment to complaint even though the pleading is subject to a sua sponte dismissal), and it will not invite Plaintiff to amend his pleading. Additionally, the Court has carefully reviewed this case pursuant to 28 U.S.C. § 1915(a)(3) and **CERTIFIES** that any appeal from this action would not be taken in good faith. *See* Fed. R. App. P. 24(a)(3). Finally, the Court concludes that the dismissal of this case for failure to state a claim will count as a strike under the 3-strikes rule in 28 U.S.C. § 1915(g). A separate judgment will enter.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge